**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------
SHIVA STEIN,                                  :
                                              :
          Plaintiff,                          :   Civil Action No. 22-cv-00093
                                              :
v.                                            :   **COMPLAINT FOR VIOLATIONS OF**
                                              :   **SECTIONS 14(a) AND 20(a) OF THE**
VONAGE HOLDINGS CORP., JEFFREY                :   **SECURITIES EXCHANGE ACT OF**
CITRON, RORY READ, CAROLYN KATZ,              :   **1934**
JOHN ROBERTS, HAMID AKHAVAN,                  :
MICHAEL MCCONNELL, PRISCILLA                  :   **JURY TRIAL DEMANDED**
HUNG, JAN HAUSER, TIEN TZUO, and              :
STEVE WARD,                                   :
                                              :
          Defendants.                         :
---------------------------------------------------------  :

      Shiva Stein ("Plaintiff"), by and through her attorneys, alleges the following upon

information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

      1.    This is an action brought by Plaintiff against Vonage Holdings Corp., ("Vonage or

the "Company") and the members Vonage's board of directors (the "Board" or the "Individual

Defendants" and collectively with the Company, the "Defendants") for their violations of Sections

14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a),

78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and 17 C.F.R. § 244.100, in connection with the

proposed merger between Vonage and affiliates of Telefonaktiebolaget LM Ericsson (publ), an

entity organized and existing under the laws of Sweden ("Ericsson").

      2.    Defendants have violated the above-referenced sections of the Exchange Act by

causing a materially incomplete and misleading Preliminary Proxy Statement on Schedule 14A

(the "Proxy Statement") to be filed on December 20, 2021 with the United States Securities and Exchange Commission ("SEC") and disseminated to Company stockholders.   The Proxy Statement recommends that Company stockholders vote in favor of a proposed transaction whereby Ericsson Muon Holding Inc. ("Merger Sub"), a wholly-owned subsidiary of Ericsson, will merge with and into Vonage with Vonage surviving as an indirect, wholly-owned subsidiary of Ericsson (the "Proposed Transaction").   Pursuant to the terms of the definitive agreement and plan of merger the companies entered into (the "Merger Agreement"), each Vonage stockholder will receive $21.00 in cash (the "Merger Consideration") for each Vonage share owned.

1.      As discussed below, Defendants have asked Vonage's stockholders to support the Proposed Transaction based upon the materially incomplete and misleading representations and information contained in the Proxy Statement, in violation of Sections 14(a) and 20(a) of the Exchange Act.   Specifically, the Proxy Statement contains materially incomplete and misleading information concerning the analyses performed by the Company's financial advisors, Qatalyst Partners LP ("Qatalyst") in support of its fairness opinion.

2.      It is imperative that the material information that has been omitted from the Proxy Statement is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can properly exercise their corporate suffrage rights.

3.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Vonage's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

5.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Vonage is traded on the NASDAQ Global Select Market, which is headquartered in this District. In addition, the proxy solicitor for Vonage for the purposes of facilitating the shareholder vote for the Proposed Transaction, MacKenzie Partners, Inc., is also headquartered in this District.

## PARTIES

7.      Plaintiff is, and has been at all relevant times, the owner of Vonage stocks and has held such stocks since prior to the wrongs complained of herein.

8.      Individual Defendant Jeffrey Citron has served as a member of the Board since January 2001 and is the Chairman of the Board.

9.      Individual Defendant Rory Mead has served as a member of the Board since July 2020 and is the Company's Chief Executive Officer.

10.      Individual Defendant Carolyn Katz has served as a member of the Board since January 2014.

11.     Individual Defendant John Roberts has served as a member of the Board since February 2015 and is the Company's Lead Independent Director.

12.     Individual Defendant Hamid Akhavan has served as a member of the Board since December 2016.

13.     Individual Defendant Michael McConnell has served as a member of the Board since March 2019.

14.     Individual Defendant Priscilla Hung has served as a member of the Board since August 2019.

15.     Individual Defendant Jan Hauser has served as a member of the Board since September 2019.

16.     Individual Defendant Tien Tzuo has served as a member of the Board since July 2020.

17.     Individual Defendant Steve Ward has served as a member of the Board since June 2021.

18.     Defendant Vonage a Delaware corporation and maintains its principal offices at Holmdel, New Jersey.  The Company's stock trades on the NASDAQ Global Select under the symbol "VG."

19.     The defendants identified in paragraphs 10-17 are collectively referred to as the "Individual Defendants" or the "Board."

20.     The defendants identified in paragraphs 10-18 are collectively referred to as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.**     **The Proposed Transaction**

21.     Vonage primarily operates as a business-to-business cloud communications company in the United States, Canada, the United Kingdom, the European Union, and Asia. It operates in two segments, Vonage Communications Platform and Consumer. The Vonage Communications Platform segment offers programmable, embeddable, and customizable application program interfaces that enable software developers to build communications capabilities, such as messaging and voice calling within their applications; and Vonage Contact Center, a cloud contact center solution. This segment also provides Vonage Business Communications, a cloud-native proprietary technology platform that delivers integrated unified communication services; and Vonage Business Enterprise, a cloud based platform for mid-market and enterprise customers that provides unified communication and collaboration services, including voice, data, video, mobile, and contact center services. The Consumer segment provides home telephone services through various service plans with basic features, including voicemail, call waiting, call forwarding, simulring, visual voicemail, and extensions, as well as area code selection, virtual phone number, and Web-enabled voicemail. In addition, the Company provides procured high-speed broadband Internet services and Vonage-enabled devices. Vonage was incorporated in 2000 and is headquartered in Holmdel, New Jersey.

22.     On November 22, 2021, the Company announced the Proposed Transaction:

> HOLMDEL, N.J., Nov. 22, 2021 (GLOBE NEWSWIRE) - - Ericsson (NASDAQ: ERIC) has entered into an agreement to acquire Vonage (NASDAQ: VG) for USD 21 per share. This represents a total acquisition price of approximately USD 6.2 billion (Enterprise Value).
>
> The merger agreement was approved unanimously by the Board of Vonage. The transaction builds upon Ericsson's stated intent to

expand globally in wireless enterprise, offering existing customers an increased share of a market valued at USD 700 billion by 2030.

Börje Ekholm, President and CEO of Ericsson, says: "The core of our strategy is to build leading mobile networks through technology leadership. This provides the foundation to build an enterprise business. The acquisition of Vonage is the next step in delivering on that strategic priority. Vonage gives us a platform to help our customers monetize the investments in the network, benefitting developers and businesses. Imagine putting the power and capabilities of 5G, the biggest global innovation platform, at the fingertips of developers. Then back it with Vonage's advanced capabilities, in a world of 8 billion connected devices. Today we are making that possible."

"Today Network APIs are an established market for messaging, voice and video, but with a significant potential to capitalize on new 4G and 5G capabilities. Vonage's strong developer ecosystem will get access to 4G and 5G network APIs, exposed in a simple and globally unified way. This will allow them to develop new innovative global offerings. Communication Service Providers will be able to better monetize their investments in network infrastructure by creating new API driven revenues. Finally, businesses will benefit from the 5G performance, impacting operational performance, and share in new value coming from applications on top of the network."

Rory Read, CEO of Vonage, says: "Ericsson and Vonage have a shared ambition to accelerate our long-term growth strategy. The convergence of the internet, mobility, the cloud and powerful 5G networks are forming the digital transformation and intelligent communications wave, which is driving a secular change in the way businesses operate. The combination of our two companies offers exciting opportunities for customers, partners, developers and team members to capture this next wave."

"We believe joining Ericsson is in the best interests of our shareholders and is a testament to Vonage's leadership position in business cloud communications, our innovative product portfolio, and outstanding team."

For Ericsson, the acquisition builds on the success of the integration of Cradlepoint in September 2020. Cradlepoint has continued to develop strongly under Ericsson's ownership.

Vonage and the Vonage Communications Platform (VCP)

Vonage, a global provider of cloud-based communications, has a strong track record of growth and margin evolution. Sales were USD 1.4 billion in the 12-month period to 30 September 2021, and over the same period, Vonage delivered an adjusted EBITDA margin of 14% and free cash flow of USD 109 million.

The cloud-based Vonage Communications Platform (VCP) serves over 120,000 customers and more than one million registered developers globally. The API (Application Programming Interface) platform within VCP allows developers to embed high quality communications - including messaging, voice and video - into applications and products, without back-end infrastructure or interfaces. Vonage also provides Unified Communications as a Service (UCaaS) and Contact Center as a Service (CCaaS) solutions as part of the Vonage Communications Platform.

VCP accounts for approximately 80% of Vonage's current revenues and delivered revenue growth in excess of 20% in the three-year period to 2020, with adjusted EBITDA margins moving from -19% in 2018 to break-even in the 12-month period to 30 September 2021. Vonage's management team projects annual growth of over 20% for VCP in the coming years.

Ericsson and Vonage – creating a winning combination

Vonage's presence in the Communication Platform as a Service (CPaaS) segment will provide Ericsson with an opportunity to access a complementary, substantial and high growth segment. With increasing investments in 4G and 5G - and a flourishing ecosystem of new applications and use cases leveraging the power of modern networks - demand from enterprises for programmable networks has been accelerating. CPaaS technologies democratize network access by offering API-enabled communications services. The CPaaS market is expected to reach USD 22 billion by 2025, growing at 30% annually. In addition, Ericsson's global leadership in 5G technology is expected to provide access to the developing space for open network APIs, which is expected to reach at least USD 8 billion by the end of the decade with a strong growth profile. CSP customers will also benefit from monetizing their network investments, optimizing the user experience and stimulating additional growth opportunities with new and advanced global network APIs and access to Vonage's unified communications and contact center solutions.

The combination of Vonage's customer base and developer community and Ericsson's deep network expertise, 26,000 R&D specialists and global reach creates opportunities to accelerate

standalone strategies and innovation in the market. This includes accelerating enterprise digitalization and developing advanced APIs made possible by 5G; putting the power of the wireless network and communications at the fingertips of the developer. Such APIs can be applied to help ensure the quality of critical services like telemedicine, immersive virtual education and autonomous vehicles as well as experiential performance benefits in gaming, augmented and extended reality, over wireless.

In the longer term, Ericsson intends to offer value benefits to the full ecosystem – telecom operators, developers, and businesses – by creating a global platform for open network innovation, built on Ericsson and Vonage's complementary solutions.

Overview of the transaction

The acquisition will be conducted by means of a merger agreement through which Ericsson will acquire all of Vonage's outstanding shares at an all-cash price of USD 21 per share. The merger consideration represents a premium of 28% to Vonage's closing share price on 19 November 2021 of USD 16.37 per share, and a premium of 34% to the volume-weighted average share price over the 3 months to 19 November 2021 of USD 15.71 per share.

The acquisition will be financed through Ericsson's existing cash resources, which amounted to SEK 88 billion as of 30 September 2021 on a gross basis, and SEK 56 billion on a net basis as of the same date.

The transaction is expected to deliver near-term revenue synergy opportunities, including white-labelling and cross-selling of the combined product portfolio estimated to contribute USD 0.4 billion by 2025. Ericsson also expects to achieve some cost efficiencies following completion of the transaction.

The transaction is expected to be accretive to EPS (excluding non-cash amortization impacts) and free cash flow before M&A from 2024 onwards.

On completion, Vonage will become a wholly owned subsidiary of Ericsson and will continue to operate under its existing name. It will be reported as a separate segment in Ericsson accounts. Vonage is headquartered in Holmdel, New Jersey in the United States with 2,200 employees throughout the United States, EMEA and APAC. Vonage's employees will remain with the company and the Vonage CEO Rory Read will join the Executive Team of Ericsson, reporting to President and CEO, Börje Ekholm. Read joined Vonage as CEO

in July 2020. With more than three decades' global technology industry experience, Read was previously Chief Operating Executive for Dell Technologies and before that, CEO of Advanced Micro Devices (AMD).

Ericsson remains fully committed to previously communicated financial targets, including long-term EBITA margins of 15-18%; long term FCF before M&A of 9-12% of sales; and a 2022 target EBIT margin of 12-14% for Ericsson Group excluding Vonage.

Completion of the transaction is subject to Vonage shareholder approval, regulatory approvals and other customary conditions and is expected within the first half of 2022.

Additional Details of the Transaction

The Vonage Board of Directors unanimously approved the transaction. The Board of Directors of Vonage recommends that Vonage shareholders approve the transaction and adopt the merger agreement.

The agreement is a result of a comprehensive review of strategic alternatives to maximize shareholder value. The Vonage Board of Directors authorized the review of strategic alternatives, which included outreach to a number of potential strategic and financial parties. Qatalyst Partners is serving as financial advisor and Weil, Gotshal & Manges LLP is serving as legal advisor in connection with the strategic review and transaction.

\* \* \*

23.     The Board has unanimously agreed to the Proposed Transaction.  It is therefore imperative that Vonage's stockholders are provided with the material information that has been omitted from the Proxy Statement, so that they can meaningfully assess whether or not the Proposed Transaction is in their best interests prior to the forthcoming stockholder vote.

**B.     The Materially Incomplete and Misleading Proxy Statement**

24.     On December 20, 2021, Vonage and Ericsson jointly filed the Proxy Statement with the SEC in connection with the Proposed Transaction.  The Proxy Statement was furnished to the Company's stockholders and solicits the stockholders to vote in favor of the Proposed Transaction.

The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's stockholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Omissions and/or Material Misrepresentations Concerning Financial Projections*

25.     The Proxy Statement fails to provide material information concerning financial projections by Arena management and relied upon by Qatalyst in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading. The Proxy Statement indicates that in connection with the rendering of its fairness opinion, that the Company prepared certain non-public financial forecasts (the "Company Projections") and provided them to the Board and Qatalyst with forming a view about the stand-alone valuation of the Company. Accordingly, the Proxy Statement should have, but fails to provide, certain information in the projections that Arena management provided to the Board and the financial advisors. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

26.     For the Company Projections, the Proxy Statement provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics: Gross Profit, Adjusted EBITDA, Non-GAAP Operating Income, and Unlevered Free Cash Flow, and Free Cash Flow – Consumer,

but fails to provide line items used to calculate the metrics and/or a reconciliation of the non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).

27.     When a company discloses non-GAAP financial measures in a Proxy Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

28.     The SEC has noted that:

> companies should be aware that this measure does not have a uniform definition and its title does not describe how it is calculated. Accordingly, a clear description of how this measure is calculated, as well as the necessary reconciliation, should accompany the measure where it is used. Companies should also avoid inappropriate or potentially misleading inferences about its usefulness. For example, "free cash flow" should not be used in a manner that inappropriately implies that the measure represents the residual cash flow available for discretionary expenditures, since many companies have mandatory debt service requirements or other non-discretionary expenditures that are not deducted from the measure.[1]

29.     Thus, to cure the Proxy Statement and the materially misleading nature of the forecasts under SEC Rule 14a-9 as a result of the omitted information in the Proxy Statement,

---

[1] U.S. Securities and Exchange Commission, Non-GAAP Financial Measures, last updated April 4, 2018, available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm

Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable

GAAP measures to make the non-GAAP metrics included in the Proxy Statement not misleading.

*Omissions and/or Material Misrepresentations Concerning Financial Analyses*

30.     With respect to Qatalyst's *Illustrative Discounted Cash Flow Analysis*, the Proxy

Statement fails to disclose: (i) the terminal value of Vonage; (ii) line items used to calculate the

Company's projected unlevered free cash flows for fiscal years 2021 through 2025; (iii) the inputs

and assumptions underlying the use of a range of multiples of fully diluted enterprise value to next-

twelve-months estimated EBITDA of 20.0x to 25.0x; (iv) the number of fully-diluted shares of

Vonage Common Stock as of November 19, 2021; (v) the inputs and assumptions underlying the

use of the range of discount rates of 6.5% to 11.5%; (vi) the estimated weighted average cost of

capital for the Company.

31.     With respect to Qatalyst's *Selected Companies Analysis*, the Proxy Statement fails

to disclose the individual financial metrics for the companies observed by Qatalyst in the analysis.

32.     With respect to Qatalyst's *Sum of Parts Analysis*, the Proxy Statement fails to

disclose: (i) the implied fully-diluted enterprise values, the estimated consensus gross profit fpor

calendar year 2022 for each of the selected application programming interface segment ("API

Segment"); (ii) the inputs and assumptions underlying the selection of the representative range of

10.0x to 20.0x; (iii) the inputs and assumptions underlying the representative range of 2.5x to 4.5x

that was applied to the unified communications and contact center segment ("UC/CC Segment");

(iv) the inputs and assumptions underlying the use of the perpetuity growth rate of –(13%); (v) the

Company's projected net debt as of September 30, 2021; and (vi) the number of fully-diluted

shares of Vonage Common Stock as of November 19, 2021.

33.     In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special stockholder meeting to vote on the Proposed Transaction, Plaintiff will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and she is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9 and 17 C.F.R. § 244.100**

34.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

35.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

36.     Defendants have issued the Proxy Statement with the intention of soliciting stockholder support for the Proposed Transaction.   Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement and the use of their name in the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections that were prepared by the Company and relied upon by the Board in recommending the Company's stockholders vote in favor of the Proposed Transaction.

37.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

38.     Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement.  The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully.  Indeed, Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of strategic alternatives.

39.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## <u>COUNT II</u>

**On Behalf of Plaintiff Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

40.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41.     The Individual Defendants acted as controlling persons of Vonage within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors of Vonage, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of Vonage, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

42.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

43.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Vonage, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy Statement at issue contains the unanimous recommendation of the Board to approve the Proposed Transaction.  The Individual Defendants were thus directly involved in the making of the Proxy Statement.

44.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

45.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

46.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

47.     Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff demands injunctive relief in her favor and against the Defendants jointly and severally, as follows:

A.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy Statement;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C.      Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 5, 2022                    **MELWANI & CHAN LLP**

                                   By:   */s/ Gloria Kui Melwani*
                                         Gloria Kui Melwani
                                         1180 Avenue of the Americas, 8th Fl.
                                         New York, NY 10036
                                         Telephone: (212) 382-4620
                                         Email: gloria@melwanichan.com

                                         *Attorneys for Plaintiff*